M & D INTERNATIONAL
CORPORATION,
Plaintiff,

v.

Kevin CHAN and King Lum,
Inc., Defendants.

Kevin CHAN and King Lum,
Inc., Counterclaimants,

v.

M & D INTERNATIONAL CORPORA-
TION, Counterclaim Defendant.

Civ. No. 93–00888HG.

United States District Court,
D. Hawaii.

July 3, 1995.

D. Barclay Bryan, Honolulu, HI, for Plaintiff/Counterclaim Defendant.

Sidney K. Ayabe, Rhonda A. Nishimura, Libkuman Ventura Ayabe Chong & Nishimoto, Honolulu, HI, for Defendants/Counterclaimants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GILLMOR, District Judge.

Plaintiff and counterclaim-defendant M & D International Corporation and Defendants and counterclaimants Kevin Chan and King Lum, Inc. having appeared before this Court in the above-entitled action, this Court having considered the arguments, evidence and testimony presented, the Court issues the following Findings of Fact and Conclusions of Law.

### I. FINDINGS OF FACT

1. Defendant and counterclaimant King Lum, Inc. (King Lum) is a Hawaii corporation and has been in the business of manufacturing and selling crystal sculptures since 1987. Defendant and counterclaimant Kevin Chan is the president and founder of King Lum, Inc. From 1981 to 1986, Kevin Chan sold manapua from a cart and ran a gift shop in Honolulu.

2. Other companies, including Diamond Head Mercantile and Crystal Selection, were displaying and marketing crystal sculptures in Hawaii upon King Lum's entry into the market in 1987. TR III at 72–73. Kit Juman Wong has been employed by King Lum as a maker of crystal sculptures since 1987. From approximately 1983 until 1987, Mr. Wong was employed by Diamond Head Mercantile.

3. Plaintiff M & D International Corporation (M & D) is a Hawaii corporation. Mi-chael Chan is the president of M & D; his brother Daniel Tran is its vice president. From 1984 to 1989, M & D marketed toys and electronics exclusively. TR I at 83. Plaintiff has been in the business of manufacturing and selling crystal sculptures since 1990. *Id.*

4. Plaintiff alleges copyright infringement of seven crystal sculpture designs (the M & D Sculptures) bearing the following names on their respective copyright registration certificates:

 a. Hibiscus Crystal;

 b. (Crystal top) Pineapple;

 c. Flower (hibiscus)/(gold top) Pineapple;

 d. (Crystal) Rose;

 e. Mini (gold top) Pineapple Clock;

 f. Oyster Clock;

 g. (Crystal top) Pineapple/Oyster/Rainbow.[1]

5. Defendants have filed counterclaims alleging copyright infringement of six crystal sculpture designs (the King Lum Sculptures) bearing the following names on their respective copyright registration certificates:

 a. Crystal Hibiscus Display;

 b. Crystal Pineapple;

 c. Crystal Gold Pineapple and Hibiscus Display;

 d. (Crystal) Rose;

 e. Oyster Clock;

 f. Gold Pineapple Clock;

6. Defendants entered the crystal sculpture business in Hawaii three years before Plaintiff. Plaintiff and Defendants attended and displayed their crystal sculptures at the same trade shows after Plaintiff's entry into the market in 1990. Michael Chan, Daniel Tran and Kevin Chan circulated through these trade shows and had ample opportunity to view the crystal sculptures displayed there by one another's companies, including the M & D Sculptures and the King Lum Sculptures. Plaintiff and Defendants are competi-

---

1. Kevin Chan testified that King Lum ceased manufacturing this design in 1992 and that it therefore is not the source of the allegedly infringing exemplar with the year 1994 stenciled on its base submitted as Plaintiff's Exhibit No.

24. With this one exception, Defendants have filed a counterclaim and defense premised on prior creation and/or registration as to each sculpture alleged by Plaintiff to have been infringed by Defendants.

tors in Waikiki and Honolulu's geographically concentrated and largely immigrant and family-run market for crystal sculptures. Kevin Chan, Michael Chan and Daniel Tran are all members of the small community of Cantonese-speaking ethnic Chinese who settled in Honolulu after leaving Vietnam at the end of the Vietnam War.

Plaintiff and Defendants sell their crystal sculptures to retail stores and boutiques closely arrayed in large part in the International Market Place and other open-air marketplaces, hotel lobbies and courtyards in and around Waikiki and Ala Moana Shopping Center. Crystal sculptures are conspicuously displayed by Honolulu retailers and are easily seen by passers-by. TR I at 81. Plaintiff and Defendants have at times had common retail customers for their crystal sculptures. Defendant Kevin Chan visited his customers from time to time both before and after Plaintiff's entry into the crystal sculpture market. Defendants had access to Plaintiff's crystal sculptures, including the M & D Crystal Sculptures, at the relevant times.

7. Before 1990, Plaintiff supplied electronics and toys to a number of Waikiki retail stores and boutiques purchasing, displaying and marketing Defendants' crystal sculptures. Before 1990, Daniel Tran, Plaintiff's vice president, discussed the sale of crystal sculptures with the owner of one such boutique, Ann Choe of Maxim's Jewelry in Hilton Hawaiian Village. Ann Choe is Defendant Kevin Chan's sister-in-law. Before 1990, Michael Chan observed Defendants displaying their crystal sculptures at a trade show in Honolulu. TR I at 74.

Before 1990, Michael Chan and Daniel Tran assisted their father in running his jewelry business from a store in Waikiki. "Archies", a seller of tourist souvenirs in Waikiki's International Market Place, displayed and sold Defendants' crystal sculptures from a cart near their father's shop during this period. Michael Chan recalled observing crystal sculptures being sold at Archie's. TR I at 79. Plaintiff had access to Defendants' crystal sculptures, including the King Lum Crystal Sculptures, at the relevant times.

8. *Hibiscus Crystal.* The exemplar of Plaintiff's Hibiscus Crystal submitted as Plaintiff's Exhibit No. 1 consists of five identical petal-shaped crystal pieces joined in the shape of an open flower. A nylon stem with three tiny red crystal anthers and a somewhat larger red crystal stigma protrudes from a red crystal ovary. Small, circular red dots are clustered on the portion of the petals nearest the ovary. The exemplar of Defendants' Hibiscus Crystal submitted as Plaintiff's Exhibit No. 3 consists of five petal-shaped pieces identical to one another and, apart from their somewhat smaller size, to those comprising Plaintiff's Exhibit No. 1. The red crystal anthers and ovary are somewhat larger than those used in Plaintiff's Exhibit No. 3. Plaintiff's Hibiscus Crystal has seven red dots per petal; Defendants' Crystal Hibiscus has four dots per petal. The two flowers are depicted in similarly open positions.

Plaintiff's Copyright Registration Form No. VA 438 948 for this work lists a January 11, 1991 registration date, September 23, 1990 date of first publication, and a 1990 date of creation. Defendants' Copyright Registration Form No. VA 468 094 for "Crystal Hibiscus", originally evidenced by Defendants' Exhibit No. 5, lists a April 10, 1991 registration date, May 8, 1987 date of first publication and 1987 date of creation.

Defendants' Exhibit No. 5 consists of a Certificate of Copyright Registration bearing the seal of the United States Copyright Office, a color photograph of a crystal hibiscus on a mirror base and a drawing of the work from above and in profile. The pattern of dots in the photograph differs considerably from the pattern in the drawing. The pattern of dots in the photograph is more similar in number and arrangement to the exemplar of Defendants' Hibiscus Crystal submitted as Plaintiff's Exhibit No. 3. At the close of trial, Plaintiff's counsel proved that Defendants' Exhibit No. 5 did not contain a true copy of the deposit materials on file with the Copyright Office for King Lum's Crystal Hibiscus.

Defendants subsequently entered into evidence Defendants' Exhibit No. 59, a true

copy of the registration statement and deposit materials for Defendants' Hibiscus Crystal. The deposit materials attached to the true, certified copy consist solely of the same drawing plus a detailed description of its components and their source. The description indicates that Defendants' Hibiscus Crystal is made from five stock petal pieces, Art. No. 8901, manufactured by Swarovski America Ltd. (Swarovski), a Rhode Island-based company in the business of manufacturing and selling crystal sculptures and prefabricated components for crystal sculptures. The anther and ovary consist of Swarovski Art. Nos. 5000 and 5301 respectively. The flower is glued to a circular mirror base. *See* Defendants' Exhibit No. 59.

No photograph is included among the true deposit materials for Defendants' Hibiscus Crystal. Defendants altered the deposit materials submitted with Defendants' Exhibit 5. This alteration made less obvious that Defendants assembled their Hibiscus Crystal almost entirely from stock parts manufactured by a third party.

9. *Crystal Top Pineapple.* The exemplar of Plaintiff's "Pineapple" submitted as Plaintiff's Exhibit No. 6 consists of a roughly pineapple-shaped crystal sphere and sixteen smaller blade-shaped crystals glued together in the shape of a pineapple top. The exemplar of Defendants' "Crystal Pineapple" submitted as Plaintiff's Exhibit No. 8 differs insofar as it has a twelve-leaf top.

Plaintiff's Copyright Registration Form No. VA 438 950 for this work lists a January 11, 1991 registration date, September 30, 1990 date of first publication, and a 1990 date of creation. Kevin Chan's Copyright Registration Form No. VA 469 278 for "Crystal Pineapple", originally submitted as Defendants' Exhibit No. 2, lists a September 9, 1991 registration date, May 18, 1990 date of first publication and 1989 date of creation.

Defendants' Exhibit No. 2 consists of a Certificate of Copyright Registration bearing the seal of the United States Copyright Office and a color photograph of a crystal pineapple. At the close of trial, Plaintiff's counsel proved that Defendants' Exhibit No. 2 did not contain a true copy of the deposit materials on file with the Copyright Office for King Lum's (crystal top) Pineapple.

Defendants subsequently entered into evidence Defendants' Exhibit No. 56, a true copy of the registration statement and deposit materials for King Lum's Pineapple. The deposit materials attached to the true, certified copy consist solely of a drawing plus a detailed description of its components and their source. The true deposit materials indicate that the base of King Lum's Pineapple consists of Swarovski Art. No. 8550. The crystal top is made from Swarovksi Art. No. 8721, or, in a larger version of the work, Art. No. 7821. Swarovski Art. No. 2000 is used to depict the spots on the leaves.

Defendants altered the deposit materials submitted with Defendants' Exhibit No. 2. This alteration made less obvious that Defendants assembled their crystal top Pineapple entirely from stock parts manufactured by a third party.

The exemplars of M & D and King Lum crystal top pineapples submitted as Plaintiff's Exhibit Nos. 6 and 8 appear to use the same or identical stock part for the pineapple base. The crystal tops of both works contain identical Swarovski leaf parts, although they differ in the number of leaves glued together. *See* TR I at 109. Neither exemplar has spots on its leaves of the sort depicted in Defendants' Exhibit 56. Plaintiff's Crystal Pineapple sits on a base. King Lum's version does not.

10. *Flower (Hibiscus)/ (Gold top) Pineapple.* The exemplar of Plaintiff's "Flower Pineapple" submitted as Plaintiff's Exhibit No. 10 consists of a crystal pineapple with a gold pewter top glued on a circular mirror beside a miniature version of a crystal hibiscus. The exemplar of Defendants' Crystal Gold Pineapple and Hibiscus Display differs with regard to the positioning of the red dots on the petals, the spikiness of the gold pewter tops on the pineapples, and the inclusion of the year of manufacture on the base of Defendants' work. Plaintiff's Exhibit No. 10.

Plaintiff's Copyright Registration Form No. VA 447 432 for this work lists an April 29, 1991 registration date, February 25, 1991 date of first publication, and a 1991 date of creation. Kevin Chan's Copyright Registra-

tion Form No. VA 469 278 for "Flower Gold Pineapple and Hibiscus", originally submitted as Defendants' Exhibit No. 3, lists an April 25, 1991 registration date, January 2, 1988 date of first publication and 1988 date of creation.

Defendants' Exhibit No. 3 consists of a Certificate of Copyright Registration bearing the seal of the United States Copyright Office and a drawing of hibiscus, pineapple and base. At the close of trial, Plaintiff's counsel proved that Defendants' Exhibit No. 3 did not contain a true copy of the deposit materials on file with the Copyright Office for Defendants' Crystal Gold Pineapple and Hibiscus. *See* Plaintiff's Exhibit No. 64.

King Lum subsequently entered into evidence Defendants' Exhibit No. 57, a true copy of the registration statement and deposit materials for King Lum's Crystal Gold Pineapple and Hibiscus. The deposit materials attached to the true, certified copy consist of the same drawing plus a detailed description on the same page of its components and their source. This description indicates that Defendants assemble their Crystal Gold Pineapple and Hibiscus Display from Swarovski Art. Nos. 2000, 3700, 4320 and 8550.

Defendants altered the deposit materials submitted with Defendants' Exhibit No. 3. Defendants' omission of the deposited written description made less obvious that Defendants assembled their Crystal Gold Pineapple and Hibiscus Display almost entirely from stock parts manufactured by a third party.

11. *(Crystal) Rose.* The exemplar of Plaintiff's version submitted as Plaintiff's Exhibit No. 14 consists of three concentric rings of stock petal pieces—an outer ring of six petal-shaped crystals, a middle ring of three such pieces and an inner ring of three teardrop-shaped pieces depicting the bud. The work is mounted on a circular mirror base. The exemplar of King Lum's version submitted as Plaintiff's Exhibit No. 16 differs insofar as the outer ring consists of five (as opposed to six) petal-shaped pieces and the middle ring surrounds the bud in a slightly more closed position. King Lum submitted a slightly different exemplar of its Crystal Rose, Defendants' Exhibit No. 30, with thirteen petals arranged in three concentric rings around a spherical stock piece depicting the bud.

Plaintiff's Copyright Registration Form No. VA 480 617 for this work lists a July 8, 1991 registration date, 1991 date of first publication, and a March 11, 1991 date of creation. Kevin Chan's Copyright Registration Form No. VA 455 073 for "Crystal Rose Display", originally submitted as Defendants' Exhibit No. 4, lists a July 19, 1991 effective registration date, 1990 date of first publication and May 15, 1990 date of creation.

Defendants' Exhibit No. 4 consists of a Certificate of Copyright Registration bearing the seal of the United States Copyright Office and a color photograph of a crystal rose. At the close of trial, Plaintiff's counsel proved that Defendants' Exhibit No. 4 did not contain a true copy of the deposit materials on file with the Copyright Office for King Lum's Rose.

King Lum subsequently entered into evidence Defendants' Exhibit No. 58, a true copy of the deposit materials for King Lum's Crystal Rose. The deposit materials attached to the true, certified copy consist of two drawings plus a separate page containing a detailed description of its components and identifying their source as Swarovski.

The deposit materials included with the true registration certificate for the Crystal Rose submitted by King Lum, Defendants' Exhibit No. 58, indicates that King Lum's Rose is made from Swarovski Art. No. 8901, a stock petal piece, and Swarovski Art. No. 8461, a stock piece forming the bud. The exemplar of Plaintiff's Rose submitted as Plaintiff's Exhibit No. 14 consists of nine stock petal parts identical to those used to depict the similarly configured petals in King Lum's Crystal Rose.

Defendants altered the deposit materials submitted with Defendants' Exhibit No. 4. Defendants' omission of the deposited written description made less obvious that Defendants assembled their Crystal Rose entirely from stock parts manufactured by a third party.

12. *Mini (gold top) Pineapple Clock.* The exemplar of Plaintiff's version submitted as Plaintiff's Exhibit No. 18 consists of a miniature clock glued to the face a spherical crystal piece with multiple triangular faces. A gold-colored pewter top depicting a dense head of spiky leaves is glued on top of the spherical pineapple base. This gold top pineapple and clock assembly is mounted on a circular crystal stand. M & D, like Defendants, orders its gold pineapple tops from a Taiwanese manufacturer. The exemplars of King Lum's version submitted as Plaintiff's Exhibit No. 20 and Defendants' Exhibit No. 31 differ from Plaintiff's Exhibit No. 18 with respect to the position of the winding mechanism on the clock and the use of a circular mirror (as opposed to crystal) base. Defendants' gold tops are also made by a Taiwanese manufacturer. The parties' gold tops are indistinguishable in appearance without close scrutiny.

Plaintiff's Copyright Registration Form No. VA 483 399 for this work lists a December 2, 1991 registration date, October 28, 1991 date of first publication, and a 1991 date of creation. Kevin Chan's Copyright Registration Form No. VA 455 073 for "Gold Pineapple Clock" lists a January 31, 1994 registration date, August 18, 1992 date of first publication and 1992 date of creation.

Defendants base their corresponding counterclaim on the assertion that Plaintiff's Pineapple Clock is a derivative work of Defendants' previously registered and published gold top pineapple. Defendants' Exhibit No. 33. In support of their assertion that this work is copyrighted, Defendants submit Copyright Registration Form No. VA 285 675 for a work titled "Crystal Pineapple Display." The attached deposit materials consist of a black and white drawing of a crystal pineapple and a description of the pineapple top as being "made from gold-plated pewter." Defendants' No. 8. The certificate lists an April 20, 1987 registration date, April 5, 1987 date of first publication and 1987 date of creation.

At the close of trial, Plaintiff proved that Defendants altered the deposit materials attached to Defendants' Exhibit No. 8. Plaintiff submitted a true, certified copy of registration Copyright Registration Form No. VA 285 675 and the attached deposit. Plaintiff's Exhibit No. 67. The true deposit includes three drawings from different angles of a crystal pineapple. The written description indicates that the work consists of "45 leaves on the crown. Color of leaves: gold and green." *Id.* By altering the deposited materials, Defendants obscured the differences between the pineapple depicted in the true deposit for Defendants' copyrighted Crystal Pineapple Display and the exemplar of a gold top pineapple submitted as Defendants' Exhibit No. 33. The exemplar has a distinctly gold top and apparently more leaves than the green and gold top pineapple depicted in the true deposit for Defendants' copyrighted "Crystal Pineapple Display."

13. *Oyster Clock.* The exemplar of Plaintiff's version submitted as Plaintiff's Exhibit No. 26 consists of two convex, octagonal crystals glued together in an open position along one inner, triangular surface and mounted on a circular mirror. A clock is inserted between the crystal "shell" pieces and a pearl is affixed atop the lower shell piece.

Plaintiff's Copyright Registration Form No. VA 520 748 for this work lists an August 21, 1992 registration date, May 12, 1992 date of first publication, and a 1992 date of creation. Kevin Chan's Copyright Registration Form No. VA 596 008 for "Crystal Oyster, Loving Heart, Clock" lists a January 31, 1994 registration date, January 18, 1993 date of first publication and 1993 date of creation. King Lum's work, Plaintiff's Exhibit No. 28, differs primarily in its use of two pink, heart-shaped crystals in the place of a pearl.

Defendants base their corresponding counterclaim on the assertion that Plaintiff's Oyster Clock is a derivative work of Defendants' previously registered and published Oyster. Defendants' Copyright Registration Form No. VA 472 333 for this sculpture lists a May 28, 1991 registration date, August 15, 1987 date of first publication and 1987 date of creation. The deposit to the registration statement for King Lum's Oyster, Defendants' Exhibit No. 9 indicates that "[t]his work is composed of two identical shells with a pearl on one of the shells ... The shells are using [Swarovski] Art. No. 8015." De-

fendants' Exhibit No. 9. The deposit further indicates that the "Art. No. is based on the catalogue issue by Swarovski company." *Id.* Plaintiffs' Oyster Clock appears to be made with identical stock parts plus a stock miniature clock and miniature hearts in lieu of an imitation pearl.

14. *(Crystal top) Pineapple/Oyster/Rainbow.* The exemplar of Plaintiff's version submitted as Plaintiff's Exhibit No. 22 consists of a miniature crystal top pineapple beside a miniature crystal oyster, against the background of an iridescent miniature rainbow. This combination is glued on a circular mirror base. The exemplar alleged by M & D to be King Lum's version, Plaintiff's Exhibit No. 24, is identical apart from the slightly different styling of the word "Hawaii" stenciled on the base and the addition below it of the year 1994. Defendants contend that they did not manufacture this exemplar and that they have not manufactured or marketed a crystal top pineapple/oyster/rainbow combination affixed to a mirror base since 1992. The Court finds that the exemplar submitted by Plaintiff as Plaintiff's Exhibit No. 24 does not exemplify a pineapple/oyster/rainbow combination manufactured by Defendants.

Plaintiff's Copyright Registration Form No. VA 519 559 for this work lists a June 22, 1992 registration date, May 20, 1992 date of first publication, and a 1992 date of creation. Kevin Chan holds copyright registrations in two of the three main components of this work, a crystal top pineapple and oyster, but not in this combination.

## II. CONCLUSIONS OF LAW

### A. *Jurisdiction and Venue*

This Court has jurisdiction under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* and 28 U.S.C. § 1338. Venue is proper under 28 U.S.C. § 1400(a).

### B. *Copyrightability*

██ None of the M & D Sculptures or King Lum Sculptures meets the statutory requirements for copyright protection, notwithstanding the issuance of copyright registrations for each of these works. The selection and arrangement of the stock pieces comprising these crystal sculptures lack the necessary degree of creativity and originality to give rise to original works of authorship under 17 U.S.C. § 103.

The Court recognizes that a crystal sculptor might select and arrange stock pieces of the sort at issue here into an unlimited array of copyrightable works. However, the M & D Sculptures and King Lum Sculptures do not fall within that broad range. The selection and arrangement of these works are limited by the structural simplicity of the natural subject matter—i.e., the ideas—they depict, *see Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738, 741 (9th Cir. 1971), and, at the other end, by the limited array of prefabricated components used for their expression. Given these constraints, the manner in which the parties selected and arranged these parts was more mechanical and inevitable than creative and original. Accordingly, the Court invalidates the copyright registrations for each of the M & D Sculptures and King Lum Sculptures.

### 1. *The prima facie presumption of copyrightability*

██ Registration certificates were submitted for each of the M & D Sculptures and King Lum Sculptures. A copyright registration statement is ordinarily *prima facie* evidence of the copyrightability of a work registered within five years of its first publication. 17 U.S.C. § 410(c); *S.O.S. Inc. v. Payday, Inc.,* 886 F.2d 1081, 1085 (9th Cir.1989). Section 410(c) of the Copyright Act provides that:

In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). As the statute's plain language makes clear, "although certain *prima facie* presumptions are thereby created, the courts are free to examine the underlying facts and to rebut those presumptions, should

the facts so warrant." *M. Nimmer on Copyright* § 12.11[A] at 12–160 (1994); *Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197 (9th Cir.1989). The principle behind such judicial discretion and independent assessment is sound, given that "the Copyright Office is not equipped to gauge the author's originality versus copying, and will not reject an application, even if a strikingly similar work has been previously registered." *Nimmer on Copyright,* § 12.11[B] at 12–170.1.

■ Where, as here, copyright registrations are used offensively and defensively by both parties for the same subject matter, "it might be argued that the plaintiff's and defendant's certificates cancel each other out with respect to either party's right to claim a *prima facie* presumption as to originality." *Id.* at 12–166 n. 49. With the exception as to Plaintiff's Pineapple/Oyster/Rainbow noted above at I.14, both parties seek to claim the presumptive force of copyright registration as to each of the works in dispute. In such cases, the viability of this presumption must come under close scrutiny. *See id.*

■ To the extent that either party (or both) was entitled to a *prima facie* presumption of copyrightability, the Court finds that both parties came forward with sufficient evidence to overcome such a presumption. This evidence, introduced in part I above and discussed further in II.B.2 below, included evidence of access to similar works of the other party and/or other competitors (including prior entrants in the crystal sculpture market), evidence of common reliance on stock part manufacturers and evidence of only minimal manipulation of such parts prior to their assembly into the works at issue. In addition, Defendants' alteration of the deposit materials for four of Defendants' copyrighted works further undermined Defendants' entitlement to the *prima facie* presumption or, in any event, diminished the evidentiary weight of copyright registration

as to the works involved. *Cf. Seiler v. Lucasfilm, Ltd.,* 808 F.2d 1316 (9th Cir.1986), *cert. denied,* 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987).

■ Finally, it has been suggested that an infringement "action may be maintained only to vindicate infringement of [the version of the] work deposited with the registration." *E. Mishan & Sons, Inc. v. Marycana, Inc.,* 662 F.Supp. 1339, 1342–43 (S.D.N.Y.1987); *see also, Nimmer on Copyright* § 7.17[A]. A more modest application of this principle to the instant case would deprive a plaintiff or counterclaimant of the presumption, or reduce the presumption's evidentiary weight, where the exemplar of the allegedly infringed (and infringing) work differs from the version depicted in the materials deposited with the certificate alleged to confer copyright protection on the work.

Such differences characterize the gold top pineapple submitted by Defendants as Defendants' Exhibit No. 33 and allegedly infringed by Plaintiff's Mini Pineapple Clock. The true, color diagram deposited with Defendants' "Crystal Pineapple Display" depicts a pineapple with a green and yellow top and a written description of the works as consisting of "45 leaves on the crown. Color of leaves: gold and green." Plaintiff's Exhibit No. 67. In contrast, the exemplar submitted by Defendants as Defendants' Exhibit No. 33 is distinctly gold and has more leaves.[2] While the gold top pineapple component in Plaintiff's Pineapple Clock, Plaintiff's Exhibit No. 18, no doubt resembles the exemplar submitted as Defendants' Exhibit No. 33, the resemblance of either exemplar to the "gold and green" pineapple in the true deposited materials for Defendants' Crystal Pineapple Display is less plain.

2. *The creativity and originality requirements under 17 U.S.C. § 103*

The M & D Sculptures and King Lum Sculptures consist largely of combinations of

---

**2.** These differences were originally obscured by Defendants' alteration of the deposit materials attached to the certificate for Defendants' Crystal Pineapple Display. A description in the false deposit indicates that "[t]he head of the pineapple is made from gold-plated pewter" and omits any reference to a partially green top and to the number of leaves. Defendants' Exhibit No. 8.

The true copy, on the other hand, creates ambiguity as to whether the Defendants' copyright registration depicts the same work as the exemplar of a gold top pineapple submitted as Defendants' Exhibit No. 33. As discussed above, this discrepancy and the alteration of the deposit materials further undermine the evidentiary weight of Defendants' copyright registration.

identical stock pieces readily available through trade catalogues and apparently commonly used throughout the Hawaii crystal sculpture industry.[3] This fact raises immediate concerns about the copyrightability of these sculptures but does not alone deprive the works of copyright protection. After all, "[t]he subject matter of copyright ... includes compilations ..." of preexisting material. 17 U.S.C. § 103(a). Section 101 defines "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work constitutes an original work of authorship." 17 U.S.C. § 101.

■ Copyright protection for compilations is, however, limited, insofar as it "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b). As such, a compilation—even one consisting entirely of uncopyrightable elements—may receive copyright protection to the extent it independently and creatively combines these elements. *Sem–Torq, Inc. v. K Mart Corp.*, 936 F.2d 851, 855 (6th Cir.1991).

■■ Section 103 "dictates that the principal focus should be on whether the selection, coordination, and arrangement are sufficiently original to merit protection." *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 357, 111 S.Ct. 1282, 1294, 113 L.Ed.2d 358 (1991). In *Feist*, the Supreme Court explained the originality requirement and the additional creativity requirement under section 103 as follows:

> Originality requires only that the author make the selection or arrangement independently (*i.e.*, without copying that selection or arrangement from another work), and that it display some minimal level of

creativity. Presumably, the vast majority of compilations will pass this test, but not all will. There remains a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent.

*Id.* The Supreme Court went on to find that the alphabetical arrangement of the plaintiff-respondent's telephone directory, conforming to "age-old practice," was more inevitable than original and that its selection of listings lacked "the modicum of creativity necessary to transform mere selection into copyrightable expression." *Id.*, 499 U.S. at 361–64, 111 S.Ct. at 1296–97. As discussed further below, the M & D Sculptures and King Lum Sculptures similarly fall within the "narrow category" of compilations failing to reach these low thresholds of creativity and originality in their selection and arrangement. The selection and arrangement involved in the creation of these sculptures, while related, are examined in turn below.

*3. Selection*

Only a trivial degree of originality and creativity is involved in the parties' selection of the stock parts ordered through trade catalogues, trimmed and glued together to form the familiar subject matter depicted by the King Lum Sculptures, the M & D Sculptures and, as indicated by the numerous trade catalogues submitted as Plaintiff's Exhibit Nos. 35–40, crystal sculptures made and sold by a host of competitors in Hawaii, on the mainland and overseas. *See* TR I at 123. To be copyrightable, a compilation must embody more than a trivial degree of creative selection. *See Feist*, 499 U.S. at 361, 111 S.Ct. at 1296. " 'While this requirement is sometimes characterized as modest, or a low threshold, it is not without effect.' " *Id.*, quoting Patterson & Joyce, *Monopolizing the Law: The Scope of Copyright Protection*

---

**3.** Defendant's Gold Top Pineapple appears to be an exception, insofar as King Lum presented testimony that Kevin Chan designed a gold pewter top for King Lum's version and contracted with a firm in Taiwan for the manufacture of gold tops. Defendants assert that Plaintiff's Gold (top) Pineapple Clock is a derivative of Defendants' previously registered Crystal (gold top) Pineapple Display, insofar as M & D's work

merely adds a stock miniature clock element. In spite of Defendants' alleged independent artistic contribution to the gold top, only minor differences not readily apparent to the casual observer characterize the overall aesthetic appeal of the gold pineapple tops among the exemplars of the parties' works, as well as several of the gold top pineapples displayed in competitors' catalogues submitted as Plaintiff's Exhibit Nos. 35–40.

*for Law Reports and Statutory Compilations*, 36 UCLA L.Rev. 719, 760 n. 144 (1989)

### a. *Originality*

The requisite degree of originality under section 103 is lacking in both the M & D Sculptures and King Lum Sculptures. First, in differing degrees depending on the work, all or most of their components are evidently manufactured or readily adapted to serve the function for which the parties, in common with a host of competitors, employ them. These prefabricated parts are selected from trade catalogues for assembly into popular plant and animal shapes and other "hot" tourist themes with a minimum of original intellectual labor. Secondly, both Plaintiff and Defendants had access to competitors' sculptures depicting similar subject matter apparently made from similar stock parts and raising further concerns about the originality of either party's selection of such parts.

To illustrate the first concern, although Swarovski's prefabricated crystal flower petals might be adapted to a variety of flowers, its employment by a manufacturer of sculptures for its obviously suited purpose as a flower petal in a crystal display, whether as one of the five petals forming a hibiscus or the more numerous petals comprising a rose, is not an exercise in originality or creativity sufficient to give rise to a copyright. *See* TR I at 117.

Similarly, an oyster display can be configured by pairing two identical shell-shaped pieces of virtually any size or material. However, the decision to market this idea in the crystal medium and to use prefabricated components renders mechanical rather than original the selection of the type of stock part—Swarovski Art. No. 8015 or its essentially similar predecessor, article no. 8011—to be used in its expression. *See* Defendants' Exhibit 9.

Plaintiff and Defendants' Oyster Clocks are also useful to illustrate the second problem, lack of originality vis-a-vis competitors. The record contains substantial testimony by both Kevin and Michael Chan indicating that they were familiar with oyster sculptures made by other companies before King Lum

and M & D respectively. *See* TR III at 19; TR I at 134. For example, Michael Chan explained that "I make the oysters because the oyster, I can see in the Orient, I can see in mainland. Everywhere people making the oysters. So, to me, I think the public domain item." TR I at 134. The record also includes the catalogues of four competitors, Crystal Fantasy, Crystal Reflection Inc., Summerhill and Crystal Symphony, all of which contain photographs of crystal oysters closely resembling those of M & D and King Lum. At least two and possibly all four of these catalogues, represented by Plaintiff to date back to 1991, predates the claimed dates of creation for both parties' oyster clock works and the registration date of Defendants' crystal Oyster, a similar work lacking the clock element. *See* Plaintiff's Exhibits 35, 39, 40 and 41. The crystal oysters displayed in these catalogues appear to consist of identical or substantially similar parts.

To be sure, Defendants claim to have created and published their Oyster in 1987, before the four catalogues submitted were represented to have been published. Nevertheless, there is evidence that Defendants had access to a third party's crystal oyster sculpture before creating and registering either its Oyster or, later, Crystal Oyster, Loving Heart, Clock. Kit Juman Wong testified that his former employer, Diamond Head Mercantile, made a crystal oyster and demonstrated close familiarity with the steps and parts involved in its manufacture. Diamond Head Mercantile entered the crystal sculpture market before Defendants. Mr. Wong left Diamond Head Mercantile's employment around 1986, shortly before Defendants' entry into the market. Mr. Wong attempted to distinguish Defendants' Crystal Oyster from Diamond Head Mercantile's by pointing out that Defendants' pearls were darker and less life-like and were placed on the opposite side of the oyster. TR III at 42. The Court finds these efforts to distinguish between the shading and positioning of pearls illustrative of the scant degree of originality involved in the works at issue in this case.

Defendants' substitution of crystal hearts for a pearl by King Lum did not invest the work with sufficiently original selection (or

arrangement) to trigger copyright protection. The selection of tiny hearts in place of a pearl involved at most the trivially original addition of a familiar stylistic element to the standard, widely published oyster works of the parties and their competitors. The mere addition of such elements is insufficient to establish originality. *Spectravest, Inc. v. Mervyn's, Inc.*, 673 F.Supp. 1486, 1492 (N.D.Cal.1987) ("[t]he use of the hearts ... in no way defeats the similarity of the 'total concept and feel' of the two patterns"). By the same reasoning, the selection of a clock by either party to sit inside an oyster was at most a trivially original variation on a familiar theme pairing miniature clocks with crystal sculptures. TR I at 137; TR III at 81.

The gold top pineapple is also emblematic of the M & D Sculptures and King Lum Sculptures' want of originality. Michael Chan testified that he had heard that Diamond Head Mercantile "invented" the gold top pineapple before creating works incorporating a gold top pineapple. He indicated that he felt free to do so because he understood that Diamond Head Mercantile had created the gold top pineapple and gone out of business without objecting when this design began to be "made by everybody else." *Id.* at 135.

▪▪▪ As to the Defendants' work, Kit Juman Wong testified that he helped make a gold top pineapple at Diamond Head Mercantile before joining King Lum. Mr. Wong helped Kevin Chan learn to make crystal sculptures and facilitated Defendants' 1987 entry into the crystal sculpture business after leaving the employment of Diamond Head Mercantile in or around 1986. Mr.

Wong went to great efforts to distinguish between King Lum's work and that of his prior employer. He contended that Diamond Head Mercantile's gold top pineapple looked different, insofar as its leaves bent down so as "to cover a portion of the crystal." TR III at 36. At any rate, it is evident that King Lum' gold top pineapple, like its Crystal Oyster, was based largely on the same (or superseding) stock Swarovski part as that used by Diamond Head Mercantile, a prior market entrant, to make works to which Defendants had access.[4] Defendants' gold top pineapple was only trivially original given Defendants' access to Diamond Head Mercantile's earlier creation and Defendants' use of the same Swarovski part (or its replacement) to assemble the work.

#### b. *Creativity*

To illustrate further with regard to creativity (a closely related issue in the context of stock parts and natural ideas), the decision to group stock blade-shaped parts into a nineteen-leaf crystal pineapple top and to pair this part with a 70mm crystal base, art. no. 8550, evidently widely used and readily adapted to this purpose, required only rote selection of complementary, like-sized components and trivial or no creativity in a manner characteristic of the works at issue here of both parties. *See* Defendants' Exhibit 56. Given the evidently narrow array of suitable prefabricated parts available through trade catalogues and the decision to fabricate a pineapple solely with such parts, the pineapples arrived at by both parties were more inevitable than creative. As was the case in *Feist*, "[t]his is 'selection' of a sort, but it

---

4. Kevin Chan testified that he designed the gold pewter top for Defendants' gold top pineapple and contracted with a firm in Taiwan for its manufacture. Insofar as Defendants' gold pewter top is not a stock part predesigned by a third party, the reasoning in this section may not apply squarely to Defendants' gold top pineapple. *See* Defendants' Exhibit No. 33.

Even assuming without deciding that Defendants' gold top pineapple is original, creative and therefore copyrightable, the Court finds no infringement of this work by Plaintiff. The record contains ample evidence that Michael Chan had access to and was familiar with a gold top pineapple made and marketed in Hawaii in the late 1980s by Diamond Head Mercantile, as well as

the gold top pineapples of other firms in Asia and on the mainland. T.R. I at 110–11. Michael Chan testified credibly that seeing these gold top pineapples "all over the world" gave him the idea to make his own. Plaintiffs submitted as exhibits numerous catalogues published by competitors which display gold top pineapples resembling in differing degrees the exemplars of gold top pineapple submitted by both parties. *See* Plaintiff's Exhibit Nos. 35, 36, 38 and 39. These catalogues gave Michael Chan access to numerous other gold top pineapples in addition to Defendants'. Accordingly, the Court finds the evidence insufficient to show that Plaintiff copied *Defendants'* gold top pineapple.

lacks the modicum of creativity necessary to transform mere selection into copyrightable expression." 499 U.S. at 361, 111 S.Ct. at 1296.

The Court is not persuaded by the parties' efforts to portray themselves as sculptors manipulating their material into original works dictated only by their artistic vision and training. Michael Chan testified that he went to great lengths to find a machine for cutting crystals, a process he described as very difficult. TR I at 45. While this testimony initially suggested an analogy between the parties' labors and traditional marble sculpting, later testimony and examination of the exemplars revealed that such machinery appears to be used for the artistically more modest task of shaving stock crystal parts to create a surface to which stock bases and tops can be glued or to permit the work to sit flat. TR I at 106.

To further the image of original sculptural authorship, Michael Chan also testified that he based the design for Plaintiff's crystal pineapple in part on his study of a Dole pineapple can label. If Michael Chan had crafted or adapted crystal pieces to create a three-dimensional rendition of this label based exclusively on independent study, training and even the most modest creative spark, the requisite degree of creativity and originality would almost certainly be found. *See W. Goebel Porzellanfabrik v. Action Industries, Inc.*, 589 F.Supp. 763, 767 (S.D.N.Y. 1984) ("the artists in the employ of Goebel who translated the sketches into three-dimensional art works have added sufficient creative effort to make the Hummel figures protectible under copyright laws"). But even according to his own testimony, Plaintiff's crystal pineapple also stemmed from his prior observation of gold and glass top crystal pineapples on a trip to Asia. The selection of a stock base part evidently in wide use for crystal pineapples and a leaf top consisting of another translucent material also commercially available in a stock blade part, even if assumed to be original to the author, was not sufficiently creative to merit copyright protection.

4. *Arrangement*

■ Alternatively, a compilation may constitute an original work of authorship under 17 U.S.C. § 103 by virtue of an original and creative arrangement or coordination, as opposed to selection, of preexisting material. As such, the fact that works "were made with commercially available materials does not negate their independent authorship. Independent authorship can of course arise from the assemblage of materials." *Mishan*, 662 F.Supp. at 1342–43. The Court finds at most trivial independent authorship in M & D and King Lum's assemblage of preexisting materials.

a. *Creativity*

Plaintiff cites *Mishan* in an attempt to rebut an argument that neither party's works are copyrightable because they merely combine stock parts in an unimaginative fashion. The holding in *Mishan* does not support Plaintiff's argument. In *Mishan*, a defendant in a copyright infringement action challenged the copyrightability of the plaintiff's Americana-style kitchen magnets. The plaintiff's copyrighted works "consisted of a square white card bearing a homey kitchen verse or saying written in calligraphy, with an imitation flower glued on its upper left-hand corner—pasted in the center of a cardboard square covered with calico or gingham—surrounded by a ruffled fringe of eyelet lace—with a magnet glued to the back." *Mishan*, 662 F.Supp. at 1341. The court found that "[a]lthough there is no doubt that Mary Sullivan's creation did not have a high degree of novelty and adhered to long-familiar stylistic elements, it was nonetheless an independent act of authorship and was entitled to copyright registration and enforcement." *Id.* at 1343.

This conclusion does not hold here given the considerably smaller quantum of creativity going into the M & D Sculptures and King Lum Sculptures. First, the kitchen magnets in *Mishan* combined far more main components and were dictated far less by their widely familiar stylistic elements. Moreover, the penning of a "homey kitchen verse" and the choice of materials to adorn the magnet were open-ended enterprises involving an ap-

preciable degree of independent selection and authorship. As to the works at issue here, in contrast, only a trivial degree of creativity was demanded of the "sculptor" in selecting and gluing together prefabricated components—some plainly predesigned to be deployed in substantially or precisely the manner and for exactly the subject matter arrived at by the parties—from a third party's commonly used trade catalogue.

Plaintiff's analogy between its crystal sculptures and the paintings of 19th century masters or even the kitchen magnets at issue in *Mishan* is also unpersuasive because the comparison fails to account for the extent to which the *idea* of the works at issue here, in tandem with the limited components sold and used for their assembly, restricts their expression. To be sure, this factor is most often weighed in the determination of substantial similarity, an inquiry in which copyrightability is assumed or established. *See Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir.1987) ("no substantial similarity may be found under the intrinsic test where analytic dissection demonstrates that all similarities in expression arise from the use of common ideas", viz., stuffed toy dinosaurs); *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 443 (9th Cir.1991) (no infringement found where all the similarities found between the masks "derive from the common idea of a mask depicting the man in the moon").

But such considerations are also applicable to the threshold issue of copyrightability. After all, in invalidating the plaintiff-petitioner's copyright in *Feist*, the Supreme Court considered the extent to which the idea of a white pages directory and the data comprising such directories combined to limit the range of such works entitled to protection as a "compilation" under section 103(b). 499 U.S. at 361–64, 111 S.Ct. at 1296–97. Here, the stock parts incorporated in the M & D Sculptures and the King Lum Sculptures and the idea of the flora and fauna depicted thereby pose a similarly confining pair of constraints transcended by neither party. For example, Plaintiff's Rose consists entirely of stock petal pieces, most of which are indistinguishable from those used in the exemplars of Defendants' Rose submitted by

both parties. This fact might be interpreted in another context as indicative of copying by one party or the other. But this use of common stock parts is also indicative of the limitations placed on makers of crystal sculptures by competitive pricing, their consequent dependence on mass-produced components and their resulting reliance on common suppliers for such preexisting materials.

Plaintiff, Defendants and their competitors thus set out with a common, limited supply of prefabricated components for their works. The subset of such parts useful in creating the works at issue is of course considerably smaller and thus further narrows the range of expression. However, this is not to say that any such subset necessarily promises only a highly limited number of original works of authorship. "The mere fact that component parts of a collective work are neither original to the plaintiff nor copyrightable by the plaintiff does not preclude a determination that the combination of such component parts as a separate entity is both original and copyrightable." *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 388 (5th Cir.1984), *citing Nimmer on Copyright*, §§ 3.02, 3.03.

Accordingly, even standard, uncopyrightable shapes may be formed into any number of works qualifying for protection if original, creative effort is expended in their making. In *Runstadler Studios, Inc. v. MCM Ltd. Partnership*, for example, the court rejected the defendants argument that plaintiff's "Spiral Motion is lacking in creativity because the sculpture is simply a combination of uncopyrightable standard shapes." 768 F.Supp. 1292, 1295 (N.D.Ill.1992). Spiral Motion was composed of 39 clear glass rectangles and hexahedrons forming a 24–inch spiral. The court found that "[t]he choice of location, orientation and dimensions of the glass panes, and the degree of the arc of the spiral, show far more than a trivial amount of intellectual labor and artistic expression on plaintiff's part." *Id.* at 1295–96.

A different conclusion is warranted in the instant case. Here, the parties have sought to depict familiar creatures, that is, natural "ideas", rather than ideas involving more fanciful abstraction of the sort at issue in *Runs-*

*tadler. See Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738 (9th Cir.1971) (limiting copyright protection of idea, a jeweled bumblebee, whose idea is inseparable from its expression). Of course, an author who invests his depiction of flora or fauna with a distinct, imaginative personality is almost certainly eligible for a copyright. *See Aliotti,* 831 F.2d at 901–02 (finding no substantial similarity given the different personality of the parties' stuffed dinosaurs). But the M & D Sculptures and King Lum Sculptures contain little such original artistic imagination.

Rather, the Court concludes on the basis of its extensive *in camera* examination of the exemplars submitted by both parties that their works are intended to imitate nature to the limited extent permitted by the crystal medium and in a manner largely dictated by the decision to use stock parts purchased wholesale from crystal parts manufacturers. The relatively simple physiognomy of the natural subject to be depicted, such as a hibiscus, rose or oyster, substantially confines the manner in which the stock parts are arranged. For example, given the end of creating a crystal oyster and the limited stock parts suited to this purpose, only a trifling degree of intellectual labor is required to arrive at a pairing of two identical, roughly disc-shaped crystals and the gluing together of these parts at one edge in an open position to reveal an imitation pearl.

This degree of sculptural authorship falls short of the copyrightability threshold set forth in *Feist.* In *Feist,* the Court instructed that for a compilation to qualify for copyright protection under section 103, the "selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever." 499 U.S. at 361, 111 S.Ct. at 1296. By the plain language of section 101's definition of "compilation"—"a work formed by the collection and assembling of preexisting materials or of data ...," this rule as to uncopyrightable "data" applies at least equally to "preexisting materials" incorporated into sculptural works, absent subjective and original arrangement or adaptation of these components to minimally nonobvious or unintended purposes of a sort not evident here.

In sum, where, as here, the author fails to such a degree to transcend the apparent limitations imposed by the subject and the preexisting materials, the author's work, like the directory in *Feist,* falls within the "narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent." *Id.,* 499 U.S. at 357, 111 S.Ct. at 1294. Accordingly, the Court concludes that the M & D Sculptures and the King Lum Sculptures contain an insufficient degree of creativity in their arrangement, as well as selection, to qualify for copyright protection.

b. *Originality*

As to the originality requirement, the Court is further troubled by evidence that the M & D Sculptures and King Lum Sculptures resemble preexisting works previously and widely published, registered or released into the public domain by their competitors. For example, there is considerable evidence, uncontroverted by the parties, indicating that other crystal manufacturers were making and marketing crystal oysters before either Plaintiff or Defendants claim to have created their oyster clock displays. *See* discussion *supra* at II.B.3.a.

Illustratively, Michael Chan testified that he created his Pineapple/Oyster/Rainbow combination by adding a rainbow to a third party's copyrighted pineapple/oyster display on a mirrored base. TR I at 130. Before making this arrangement, Michael Chan saw a large crystal rainbow on the mainland. TR at 133. The combination of this familiar Hawaii symbol and two other such symbols already combined in a third party's copyrighted work did not result in a sufficiently original arrangement to merit copyright protection. *See Spectravest,* 673 F.Supp. at 1492.

Given Defendants' and Plaintiff's access to trade catalogues, one another's works and the works of other crystal sculpture manufacturers, such evidence raises grave doubts about whether either party independently authored the crystal sculptures at issue here and further negates the presumption of copyrightability afforded by registration. "[C]opying need not be conscious, but 'may

be the result of subconscious memory derived from hearing, seeing or reading the copyrighted work at some time in the past.'" *Kalpakian*, 446 F.2d at 741, *quoting Howell's Copyright Law* 129 (4th ed. 1962). In this light, the close similarity among, for example, Plaintiff and Defendants' oyster clocks and the crystal oysters (minus the clock, a standard stylistic element) depicted in competitors' trade catalogues may be as indicative of constraints imposed by common ideas and materials as of copying—intentional or unconscious—by or of either party.

### 5. *The idea-expression dichotomy*

■ At the crux of copyrightability and infringement cases alike is the elusive idea-expression distinction. In its seminal infringement decision in *Kalpakian*, the Ninth Circuit, relying on Judge Hand's "striking abstraction" formulation in *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930), found that "[t]he guiding consideration in drawing the line is the preservation of the balance between competition and protection reflected in the patent and copyright laws." *Kalpakian*, 446 F.2d at 742. The *Kalpakian* court went on to hold that:

> When the 'idea' and its 'expression' are thus inseparable, copying the 'expression' will not be barred, since protecting the 'expression' in such circumstances would confer a monopoly of the 'idea' upon the copyright owner free of the conditions and limitations imposed by the patent law.

446 F.2d at 742.

■ A related but distinct formulation is appropriate here to account for differences in the competitive settings between this case and *Kalpakian*. These differences include the presence here of stock part suppliers and numerous competitors (including prior entrants to the crystal sculpture market) which manufacture and market similar works from the same or similar parts. Adapting this holding in *Kalpakian* in light of *Feist* to the copyrightability determination in this context, the Court finds that where the separation between idea and expression is narrowed by common reliance on prefabricated parts to express simple, natural ideas, mechanical combinations of such parts to express the

idea will not be protected. The Court, consistent with this formulation and after extensive *in camera* comparison of the works at issue with one another and with the deposits and depictions of third parties' works, holds that none of the M & D Sculptures or King Lum Sculptures constitutes copyrightable subject matter under 17 U.S.C. § 102 or 103.

### C. *Damages and Attorney's Fees*

■ Even if this Court had found that the M & D Sculptures and/or King Lum Sculptures are entitled to copyright protection, the prevailing party would be awarded only the minimum statutory damages. Neither party presented evidence as to actual damages at trial. Rather, before trial commenced, both parties had elected to seek statutory damages and attorney's fees pursuant to 17 U.S.C. § 504. *See* Defendants' Pretrial Statement at 3. Under section 504:

> "The copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work ... in a sum of not less than $500 or more than $20,000 as the court considers just."

17 U.S.C. § 504(c)(1). Section 412 damages and attorney's fees are exclusive of other remedies, including actual damages and injunctive relief. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 433–34, 104 S.Ct. 774, 784–85, 78 L.Ed.2d 574 (1984).

■ A copyright holder's eligibility for section 412 relief is contingent upon the timing of the registration, publication and alleged infringement of its work. "By reason of Section 412, in order for a copyright owner to be entitled to recover statutory damages and attorney's fees the work must have been registered prior to commencement of the infringement for which such remedies are sought." *Nimmer on Copyright* § 7.16[C]. Failure to register a work prior to publication or within a three month grace period

thereafter results in ineligibility for section 412 relief.[5]

 Even assuming either party had succeeded in demonstrating copyrightable subject matter and infringement, section 412 forecloses their recovery of damages and attorney's fees for a majority of both the claims and counterclaims. For example, neither party registered its crystal top pineapple within three months of the date of first publication set forth in their respective registration certificates. Each party's claimed date of first publication precedes the other party's effective date of registration for the work. Under section 412, both parties are thus ineligible for statutory damages or attorney's fees with respect to the crystal top pineapple, irrespective of the copyrightability of the work.

 Accordingly, in conjunction with the findings herein, section 412 bars recovery by Plaintiff on its claims as to the following works:

a. Hibiscus Crystal;

b. (Crystal top) Pineapple;

c. (Crystal) Rose;

d. Oyster Clock.

Likewise, section 412 bars recovery by Defendants on their counterclaims as to the following works:

a. Crystal Hibiscus Display;

b. Crystal Pineapple;

c. Crystal Gold Pineapple and Hibiscus Display;

d. Oyster Clock.

As to the claims and counterclaims relating to the remaining works, section 504(c) provides that statutory damages for copyright infringement shall be awarded "in a sum of not less than $500 or more than $20,000 as the court considers just." Even if the parties had succeeded in showing that these remaining works were copyrightable, given the minimal strength and credibility of the evidence presented by both parties in this case, the Court finds that justice would require only minimal damages under section 504(c).

Pursuant to Judge Ezra's Order Granting Defendants Motion for Leave to File Counterclaim, filed November 18, 1994, Plaintiff is nevertheless entitled to all "necessary and reasonable attorney's fees incurred in completing the requisite discovery by the Magistrate Judge as to the Counterclaim[s]." Any finding of fact which may be deemed, in whole or in part, more properly a conclusion of law shall be deemed as such, and any conclusion of law which may be deemed, in whole or in part, more properly a finding of fact shall be deemed as such.

### III. CONCLUSION

The M & D Crystal Sculptures and King Lum Crystal Sculptures lack the requisite degree of sculptural authorship to constitute copyrightable subject matter under the Copyright Act. Plaintiff did not copy Defendants' gold top pineapple. Plaintiff is entitled to all necessary and reasonable attorney's fees incurred in conducting discovery with respect to Defendants' counterclaims pursuant to the terms of Judge Ezra's 11/18/94 order.

IT IS SO ORDERED.

---

**5.** Section 412 provides that "no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for—

(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work."

17 U.S.C. § 412.